UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY IANNITELLI . DOCKET NUMBER: CA 05-975

Plaintiff,

vs. . Washington, D.C.
. August 7, 2007

UNITED STATES OF AMERICA
DEPARATMENT OF THE
INTERIOR . 11:00 A.M.

Defendant.

. . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE GLADYS KESSLER
A UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

MICHAEL N. PADWAY, ESQUIRE
MICHAEL PADWAY & ASSOCIATES
595 Market Street
Suite 2520
San Francisco, CA 94105
(415) 777-1511
(415) 777-1511 (fax)
mmxyzp@aol.com

FOR THE DEFENDANT:

BENTON GREGORY PETERSON
ASSISTANT UNITED STATES ATTORNEY
Judicial Center Building
Civil Division
555 Fourth Street, N.W.
Room E-4905
Washington, D.C. 20530
(202) 514-7238
(202) 515-8780 (fax)
benton.peterson@usdoj.gov

THE COURT REPORTER: SUSAN PAGE TYNER, CVR-CM
Official Court Reporter
United States District Court
333 Constitution Avenue, N.W.
Room 6523
Washington, D.C. 20001
(202) 371-2230
susantyner@verizon.net

Computer aided transcript prepared with the aid of SpeechCAT.

P R O C E E D I N G S

THE COURT: We have one other case that is on my calendar, and for some reason I know why, it didn't make it on to the written calendar, but I want to assure the lawyers that it is on my calendar, but I do think we are probably taking it last, and everybody has had to wait, and I am sorry.

This is Iannitelli versus the United States. It is CA 05-975. Would everyone come forward and identify themselves for the record, please.

MR. PETERSON: Good morning, Your Honor. Benton Peterson for the government.

THE COURT: Good morning.

MR. PADWAY: Good morning, Your Honor. Michael Padway for the defendant, Nancy Iannitelli.

THE COURT: I am sorry about the delay. We got started very late, everybody. It was not the most organized -- it was an organized morning, it is just that one counsel was very late, and so that did it.

All right. I gather -- I am really disappointed that mediation was unsuccessful in this case.

Who did you go before? Was it a mediator, or was it a magistrate judge?

MR. PETERSON: It was a mediator, Your Honor.

THE COURT: All right. Well, I am not supposed to

know who the mediator was.

MR. PETERSON: I understand.

THE COURT: But Mr. Padway, there was no chance of reaching settlement?

MR. PADWAY: No. I don't agree with that assessment at all. This is a difficult fact pattern. The plaintiff has thoracic outlet syndrome, which is a condition so rare that it constitutes about half of --

THE COURT: What is the name of it?

MR. PADWAY: Thoracic outlet syndrome. It is the clavicle is fixed at the sternum but moves with the scapula, so it makes a hinge kind of compression structure.

In that structure is the subclavian artery, the subclavian vein, some pretty important nerves that go into the arm, and a lot of lymphatics.

THE COURT: Is that as a result of the accident, or did he just have that problem?

MR. PADWAY: Oh, no, this is as a result of the accident. There is no history of it. Clinically this -- the clinical findings include coldness in the hands and pain in the hands. There is no history of that whatsoever.

The literature is quite clear that it does not take a significant impact to cause this kind of a condition, but from a defense standpoint, it is a difficult thing, because it is hard to find doctors who understand this and

so forth.

THE COURT: This is all under the Federal Tort Claims Act, right?

MR. PADWAY: Correct.

MR. PETERSON: If I might be heard, Your Honor, on that point?

THE COURT: Yes.

MR. PETERSON: The one issue that makes it more difficult was the fact that the diagnosis of thoracic outlet syndrome was not made until well after the plaintiff had already been examined by our examining physician, and that examining physician, of course, was not looking out for thoracic outlet syndrome. Instead, he was an orthopedist looking at general maladies complained about by the plaintiff.

So we get to mediation and, you know, the idea or the claim that was not announced in the administrative area that the plaintiff had thoracic outlet syndrome as a result of this collision --

THE COURT: So what does all of that mean, that you should have a re-examination?

MR. PETERSON: This is precisely our point. If mediation were to go forward in any form, shape or fashion, we need to know from our perspective, from our treating physician, what is the likelihood that the plaintiff

actually has thoracic outlet syndrome? What is the likelihood that it was caused by a five mile per hour crash from the rear bumper? And any other conclusions that our physician could come towards through a reasonable degree of medical certainty.

We don't have that information right now, and mediation could not have been successful. We would have just been taking the plaintiff at word value about what he is suffering and what is the cause of that suffering, which is yet to be determined.

THE COURT: Well, Mr. Padway, do you have any such information at this point or reports?

MR. PADWAY: Yes. We have an MRI, MRA. We actually brought a printout if the court is interested. It shows very clearly the compression in three-D form. I made sort of a video of it with explanations for the edification of counsel.

I think really what is critical to get this case settled is the deposition of the diagnosing neurologist and the diagnosing radiologist be taken in San Francisco. We had hoped to get that done this summer.

THE COURT: Why did you bring this here? I notice you are from San Francisco. Not that I have anything in the world against that. I love that city. But I mean just logistically, I'm curious?

MR. PADWAY: It is kind of a long story.

THE COURT: Well, no, don't give me a long story.

MR. PADWAY: I like to keep my Bar card active here, and the requirement is that I handle cases periodically.

THE COURT: I see.

MR. PADWAY: The accident occurred in the District.

THE COURT: That is fine.

So does the government agree that those two depositions are crucial?

MR. PETERSON: In addition to an examination of the plaintiff, yes. Those three activities are crucial to any mediation going forward and being successful.

THE COURT: I have never entered a scheduling order, everybody, or I don't believe I have. I am quite sure I have not.

MR. PETERSON: That is correct, Your Honor.

THE COURT: Can we at this point agree that within a given time frame, which I can assure you I will set, that those two depositions and the IME will be completed, and then -- I will get to that in a minute, but tell me the time frame in which that can be done. Can that be done by the end of September? You are talking about three doctors really.

MR. PADWAY: I pretty much doubt that.

THE COURT: You doubt it?

MR. PADWAY: I doubt it also.

THE COURT: This case is getting old, everybody.

MR. PADWAY: In terms of my schedule for September. October is a better time frame for me at this point.

THE COURT: By the end of October.

MR. PETERSON: And a lot of that depends in large part on the plaintiff in terms of submitting to another exam.

MR. PADWAY: I don't want to just gloss over the defendant's medical issue. They have had one defense medical already. The plaintiff lives in Florida. It is very inconvenient for her to show up for that.

I have advised counsel that I would be willing to consider a second defense medical examination, but only after we have explored the possibility of getting this settled based on the two depositions which are going to have to be taken in any event.

THE COURT: When can the two depositions be completed?

MR. PETERSON: I want to --

THE COURT: Wait, Mr. Peterson. You keep on interrupting.

MR. PETERSON: I am sorry.

THE COURT: When can the two depositions be completed?

MR. PADWAY: I would hope they could be completed by the end of October.

THE COURT: Oh, I would certainly hope so.

MR. PADWAY: It depends on Mr. Peterson.

THE COURT: That is two and a half months, everybody. Almost three months, and this is a 2005 case. No. This case has been too slow. Some of it may have been my fault, I am not sure.

All right, this is what we are going to do. The depositions are absolutely to be completed by October 15, everybody. You talk to your doctors, and you get this set. Then you come back for a status, unless you object Mr. Padway for some reason, because I am concerned about your coming to and fro, but can you come back for a status after that?

MR. PADWAY: I can. I would certainly much prefer if I could do it by phone.

THE COURT: Do it by what?

MR. PADWAY: If I could appear by telephone.

THE COURT: Yes. I will certainly expect though that counsel will have talked after the completion of those two depositions and before our status.

You may do it by telephone. We will set that right now. We will issue an order for today, and it will be a scheduling order, although it will only cover the completion of those two depositions.

We will set, as I say, the conference call in October, and I think it makes sense to give everybody a little bit of time to talk, so I will set it the week of October 29. Of course obviously there is a three-hour difference.

Mr. Padway, if you are in San Francisco, what is your preference in terms of when you want it? Do you want that status call during what would be a lunch hour break for me in my trial?

MR. PADWAY: That would be wonderful.

THE COURT: All right. We can do it Monday Tuesday or Wednesday of that week. Mr. Peterson, do you have any preference?

MR. PETERSON: Wednesday would be a better day for me, Your Honor.

THE COURT: I am going to make it at 12:30, and Mr. Padway, you are going to have to work out with Ms. Hightower exactly what you should do to call in.

THE COURTROOM DEPUTY: That is the 31st?

THE COURT: Yes. And it will be listed as a status conference. I will certainly try to do it at 12:30,

but as you know, you know, it might be a couple of minutes late, but I don't think it will be very late. We would just be finishing up a witness or coming to a natural break.

So that is where we stand. Two depositions. The two of you talk and discuss the value of those depositions, and then we will have a status conference as to where we go next.

MR. PADWAY: Great. It would be my hope that we could take those depositions on video take for use at trial given the logistics.

THE COURT: Would there be a government objection to that?

MR. PETERSON: This is the first time I'm hearing that, but at this point I don't have an objection to that. I don't think that that would be objectionable to do it by video taping it.

THE COURT: Obviously if there is no objection I have no objection. It makes sense given where everybody is.

Okay, counsel may be excused at this time -- is there something else?

MR. PETERSON: I just wanted to alert the court. Just in terms of setting a realistic timeframe for mediation, because I do believe my client would expect that the plaintiff would be re-examined before we get to the mediation table.

I am optimistic about the educational value of having a deposition of the treating physicians. I think that that would be very helpful. I don't think that it would be exclusively helpful for -- or it would just be a pedagogical exercise for me to learn more about the actual diagnosis.

Until I'm able to assess whether the plaintiff has this syndrome or not, I don't know if we are going to have effective, or as effective talks as we should have by the time the status arrives.

I don't want to set the court up for an expectation that can't be met by the 31st.

That is the only thing that I wanted to say, Your Honor.

THE COURT: Well, Mr. Padway did not want a second IME until there were some discussions about those two depositions.

MR. PETERSON: I am open to discussion, I am open to taking depositions, seeing what I learn, but it seems hard to me to see at this point how those depositions can be conclusive or provide us with the necessary information to come to the mediation table and talk seriously.

THE COURT: Well, when you come back we will certainly discuss that, and I am going to enter hard and fast deadlines then.

This is going to be a bench trial, right?

MR. PETERSON: That is correct.

THE COURT: And we will need to know where we are going, that is all. It is that simple.

MR. PADWAY: At least the way that I envision it, the only issues for the court are going to be whether or not this injury was caused by this accident, and if so what damages.

THE COURT: And, of course, course I have no view on that.

I also want parties to be thinking about whether they would agree to have that bench trial in front of a Magistrate Judge given my calendar, which is very crowded right to now.

Of course we are talking the end of October, but I know that I have trials scheduled through the spring, certainly. So you ought to be thinking about that.

MR. PADWAY: Thank you, Your Honor. I think that we would both agree this absolutely is a case that should be settled.

THE COURT: All right. Parties may be excused at this point.

MR. PADWAY: Thank you, Your Honor.

(Whereupon, the proceedings were adjourned.)

- - - - -

CERTIFICATE OF COURT REPORTER

I certify that the foregoing is a correct transcript of the proceedings in the above-captioned case.

SUSAN PAGE TYNER, CVR-CM

OFFICIAL COURT REPORTER